UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| PATRICIA G. WILLIAMS | CIVIL ACTION NO. 16-1615 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| BIOMEDICAL RESEARCH FOUNDATION HOSPITAL HOLDING, LLC, ET AL. | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment (Record Document 25) filed by Defendants, BRFHH Shreveport, LLC d/b/a University Health Shreveport (erroneously designated in caption as Biomedical Research Foundation Hospital Holdings, LLC) and Biomedical Research Foundation of Northwest Louisiana (hereinafter collectively referred to as "BRFHH"). BRFHH seeks the dismissal of Plaintiff Patricia G. Williams' ("Williams") Title VII retaliation suit on the grounds that Williams cannot establish a *prima facie* case of retaliation. See id. BRFHH also contends that summary judgment in its favor is proper because it had legitimate, non-retaliatory reasons for all actions challenged by Williams and Williams cannot show pretext. See id. Williams has opposed the Motion for Summary Judgment. See Record Document 34. For the reasons set forth below, BRFHH's Motion for Summary Judgment is **GRANTED** and Williams' retaliation claim is **DISMISSED WITH PREJUDICE**.

**FACTUAL AND PROCEDURAL BACKGROUND**

Williams, a black female, has brought a retaliation suit against her former employer, BRFHH. See Record Document 1. She alleges that she was retaliated against by BRFHH because of her charge of discrimination and a federal lawsuit against the Board of Supervisors of Louisiana State University Agricultural & Mechanical College ("LSU"),

wherein she challenged events that happened in 2008. See id.[1]

Prior to October 1, 2013, Williams worked at LSU's Health Sciences Center ("LSUHSC") in Shreveport since 1975. See id. at ¶ 9. Williams was originally employed as an operating room nurse until she was promoted to Nursing Director in 1985. See Record Document 25-1 at ¶ 3. In 1993, she was again promoted, this time to Assistant Hospital Administrator in the Ambulatory Care Division, which oversaw LSUHSC's outpatient care system, often referred to as "clinics." See Record Document 25-1 at ¶ 4; Record Document 34-1 at 1. Williams continued to be employed by LSU in that position until September 30, 2013, the date LSU ceased operations at the hospital. See Record Document 30-9 (Williams Deposition) at 16-17, 47.

In 2013, LSUHSC was privatized and the state turned over management and operations of the hospital to BRFHH, effective October 1, 2013. See Record Document 25-1 at ¶ 9; Record Document 30-9 at 16-17, 47. BRFHH retained Alvarez & Marsal Healthcare Industry Group, LLC ("A&M") to help with the transition from public to private and to provide interim management services, among other services. See Record Document 25-1 at ¶ 10; Record Document 34-1 at 1; Record Document 25-8 (Sandra

---

[1]"On June 10, 2008, Williams filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against LSU, alleging that LSU unlawfully failed to promote her and denied her a pay increase because of her race." Williams v. Louisiana, No. CIV.A. 10-1670, 2013 WL 4539006, at *2 (W.D. La. Aug. 27, 2013). In July 2010, she amended the charge to include a claim of retaliation. See id. The EEOC took no action other than to issue a right to sue letter. See id.
  On November 1, 2010, Williams timely filed a lawsuit in this court against LSU and Joe Miciotto, alleging failure to promote, unequal rate of pay, retaliation, and hostile work environment pursuant to pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) and 42 U.S.C. §§ 1981 and 1983, respectively. See id. On August 27, 2013, Williams' lawsuit was dismissed. See id. She did not file an appeal. See Record Document 25-1 at ¶ 7.

Austin Deposition) at 33; Record-Document 25-10 (Richard Cascio Deposition) at 24-28. The terms of the engagement with A&M were finalized on or about April 29, 2013. See Record Document 25-1 at ¶ 11; Record Document 25-8 at 33; Record-Document 25-10 at 24-28 & Exhibit 1. All LSUHSC employees were terminated effective September 30, 2013. See Record Document 25-1 at ¶ 11; Record Document 25-7 at 46-47. All LSU employees wishing to work for BRFHH starting October 1, 2013, were told they needed to complete the BRFHH application process. See Record Document 25-1 at ¶ 11; Record Document 25-7 at 33-35 & Exhibit 2.

The online application process was to begin in early August 2013. See Record Document 25-1 at ¶ 12; Record Document 25-7 at 58-59. However, in August 2013, Sandra Austin ("Austin"), the A&M Managing Director, and her team had not yet had an opportunity to do an in-depth assessment of the clinics. See Record Document 25-1 at ¶ 12; Record Document 25-8 at 76; Record Document 25-13 (Kathleen Millgard Deposition) at 38, 56, 58-59. Austin made the decision that as a general rule everyone in the clinics who wished to continue working in the clinics as of October 1, 2013 would retain their current position until such time as the clinic operations and structure could be reassessed. See id.

Austin ultimately wanted to restructure the clinics, that is, migrate the clinics to a different business model. See Record Document 25-1 at ¶ 13; Record Document 25-8 at 50-51, 53-56. Williams recalled that Austin spoke with her about the plan to eventually reorganize or restructure the clinics and that her current job as Assistant Hospital Administrator, Ambulatory Care Services would be temporary, specifically four to six months. See Record Document 25-1 at ¶ 14; Record Document 25-7 at 67-69. On August

2, 2013, Austin reported in an email to other A&M personnel that she had a discussion with Williams about her plan to reorganize the clinics; informed Williams that her position would most likely be eliminated sometime over the next four to six months; and informed Williams that any new director of the clinics will require someone with substantial experience running a Federally Qualified Health Center ("FQHC") or a multi-specialty group practice model. See Record Document 25-1 at ¶ 15; Record Document 25-8 at 70-71, 74-76 & Exhibit 5. Williams denies the meeting discussed in the August 2, 2013 email. See Record Document 34-1 at 3-4.

On August 7, 2013, Williams applied for three alternate positions. See Record Document 25-1 at ¶ 16; Record Document 25-7 at 58-59. Her first choice was Executive Director of Surgical Services position; her second choice was the VP of Special Projects position; and her third choice was a generic Assistant Hospital Administrator position (a position which was never filled). See id.[2] On or about August 14, 2013, Williams also applied for the Assistant Hospital Administrator — Ambulatory Care Admin position. See Record Document 25-1 at ¶ 17; Record Document 25-7 at 63.

Kathleen Millgard ("Millgard") was the A&M consultant tasked with filling the Executive Director of Surgical Services position. See Record Document 25-1 at ¶ 18; Record Document 25-13 at 31. Several people applied for this position, including Veronica Poole ("Poole") and Williams. See Record Document 25-1 at ¶ 18; Record Document 25-13 at 41-42; Record Document 25-7 at 50. Millgard interviewed both Poole and Williams, and she also spoke with a group of physicians who would be interacting with the person

---

[2]There is no record evidence indicating that the generic Assistant Hospital Administrator position was ever filled. See Record Document 25-1 at ¶ 23.

in this position.  See Record Document 25-1 at ¶ 19; Record Document 25-13 at 41-42, 73-77.  Millgard selected Poole for the Executive Director of Surgical Services position.  See Record Document 25-1 at ¶ 20; Record Document 25-13 at 72-77; 97-98.

Austin was the person who was responsible for filling the VP of Special Projects position.  See Record Document 25-1 at ¶ 21; Record Document 25-8 at 82-90.  Austin formally interviewed both Jackie Robinson Blakes ("Robinson Blakes") and Williams.  See Record Document 25-1 at ¶ 22; Record Document 25-8 at 82-83, 86; Record Document 25-7 at 48-49.  Austin ultimately chose Robinson Blakes for the VP of Special Projects position.  See Record Document 25-1 at ¶ 22; Record Document 25-8 at 84-85, 88-90, 93.

On August 19, 2013, Austin emailed Williams to let her know that she would be receiving a formal, written offer the for the Assistant Hospital Administrator — Ambulatory Care position and that as previously discussed the offer would be for a 4-6 month period or until such that they restructure the clinics.  See Record Document 25-1 at ¶ 24; Record Document 25-7 at 65-68 & Exhibit 4; Record Document 25-8 at 148-49 & Exhibit 7.  Williams accepted the written offer on August 21, 2013.  See Record Document 25-1 at ¶ 25; Record Document 25-7 at 68-69 & Exhibit 5.

In or about early January 2014, a meeting was held to re-evaluate what BRFHH/A&M wanted to do with the clinics.  See Record Document 25-1 at ¶ 27; Record Document 25-10 at 30; Record Document 25-13 at 90-91, 113-16; Record Document 25-12 (Robert Lindsey Deposition) at 70-72.  Rich Cascio (interim BRFHH CEO effective October 1, 2013), Millgard, Joe Miciotto, Holly Hargrove (BRFHH's in-house counsel), and Rob Lindsey were among the attendees.  See id.  During the meeting it was decided that Williams' temporary position would end and BRFHH/A&M would pursue hiring an external

candidate who had significant experience concerning financial matters and the necessary skills to restructure the clinics. See Record Document 25-1 at ¶ 28; Record Document 25-10 at 30; Record Document 25-13 at 113-16; Record Document 25-7 at 100-101. Holly Hargrove and Rob Lindsey met with Williams on January 14, 2014, to let her know that her temporary position was ending effective immediately and they presented her with a severance package. See Record Document 25-1 at ¶ 29; Record Document 25-7 at 17, 91-99; Record Document 25-12 at 86-89.

BRFHH has now moved for summary judgment as to Williams' retaliation claim on the grounds that Williams cannot establish a *prima facie* case of retaliation; it had legitimate, non-retaliatory reasons for all actions challenged by Williams; and Williams cannot show pretext. See Record Document 25. Williams has opposed the Motion for Summary Judgment, arguing there are disputed material facts showing a causal link and pretext. See Record Document 34.

## LAW AND ANALYSIS

**I.    Summary Judgment Standard.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394

F.3d 311, 315 (5th Cir. 2004).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. See Tubacex, Inc. v. M/V Risan, 45 F.3d 951, 954 (5th Cir. 1995).

If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). Where the parties dispute the facts, the Court must view the facts and draw reasonable inferences in the light most favorable to the plaintiff. See Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769 (2007). In sum, the motion for summary judgment "should be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Celotex Corp., 477 U.S. at 323, 106 S.Ct. at 2553.

II. **Retaliation Claim.**

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show

that "(1) [she] engaged in conduct protected by Title VII; (2) [she] suffered a materially adverse action; and (3) a causal connection exists between the protected activity and the adverse action." Cabral v. Brennan, 853 F.3d 763, 766-767 (5th Cir. 2017). If the plaintiff makes a *prima facie* showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action. See McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2007). The employer's burden is only one of production, not persuasion, and involves no credibility assessment. See id. If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose. See id. To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer. See id.

Williams' case turns on the third element of her *prima facie* case, as neither party disputes elements one and two. Williams must demonstrate a causal connection between her participation in an activity considered protected under Title VII and the employer's adverse employment decision. See id., 492 F.3d at 557. More specifically, Williams must show that her protected activity was a but-for cause of the employer's adverse employment action rather than simply a motivating factor. See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362, 133 S.Ct. 2517, 2534 (2013). "Mere knowledge [of the plaintiff's protected activity] is not sufficient alone to establish a *prima facie* case for retaliation." Standley v. Rogers, 202 F. Supp.3d 655, 670 (W.D. Tex. 2016), *aff'd*, 680 F. App'x 326 (5th Cir. 2017). "Temporal proximity between an employer's knowledge of protected activity and an adverse employment action can serve, in some instances, as indirect evidence of a causal link." Id., citing Strong v. Univ. Healthcare Sys., LLC, 482 F.3d 802,

808 (5th Cir. 2007).  Yet, "the proximity between the employer's knowledge and the adverse employment action must be very close."  Standley, 202 F.Supp.3d at 670, citing Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511 (2001); see also O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (3–month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174–1175 (7th Cir. 1992) (4–month period insufficient). "While a plaintiff's burden to establish a *prima facie* case of retaliation is not an arduous one, mere speculation is insufficient to establish a genuine issue of fact."  Standley, 202 F.Supp.3d at 670; see also Byers v. Dallas Morning News, Inc., 209 F.3d 419, 426-427 (5th Cir. 2000).

Williams maintains that she has established her *prima facie* case of retaliation.  She contends that A&M, the decisionmakers for BRFHH, were informed of her protected activity between May and August 2013.  See Record Document 34 at 13.  Additionally, in her Statement of Facts/Disputed Material Facts, Williams stated:

> Prior to making any employment decisions in August 2013, LSU told A&M/UHS about pending lawsuits against LSU, specifically the pending race discrimination lawsuits by Williams and Wannetta Keels.

Record Document 34-1 at 2.  It is undisputed that Williams was terminated on January 14, 2014.  See Record Document 1 at ¶ 23.  Accepting these facts as alleged by Williams as true, there was – at a minimum – an approximate four and a half month gap (August 2013-January 14, 2014) between BRFHH's knowledge of Williams' protected activity and the adverse employment action, i.e., Williams' termination.  These events are too distant to establish a causal link based on temporal proximity.  The Breeden court held that temporal proximity must be "very close" and favorably cited cases that held three and four month

gaps in time were too lengthy to establish causation. See Breeden 532 U.S. at 273, 121 S.Ct. at 1511. Mere knowledge of Williams' past lawsuit on the part of A&M is insufficient to survive summary judgment given the "but-for" causation standard.

Williams also points to the August 2013 email from Austin to other A&M personnel, the decisionmakers' unexplained negative view of her, and other speculative information as evidence of causal connection. See Record Document 34 at 13-15. At best, Williams' contentions are mere conjecture and such evidence more likely falls within the type of evidence to be possibly considered at the pretext stage, a stage Williams never reaches because she cannot establish a *prima facie* case of retaliation. Summary judgment in favor of BRFHH is, therefore, appropriate as to Williams' retaliation claim.

## CONCLUSION

Based on the foregoing analysis, this Court holds that Williams is unable to establish a *prima facie* case of retaliation, as she cannot show a causal connection between her protected activity and her termination. Accordingly, BRFHH's Motion for Summary Judgment (Record Document 25) is **GRANTED** and Williams' retaliation claim is **DISMISSED WITH PREJUDICE**.

A Judgment consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 2nd day of July, 2018.

_____
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT